HILL *v.* TALBERT.

4-8004

197 S. W. 2d 942

Opinion delivered December 9, 1946.

*Reinberger & Eilbott* and *Gene Baim,* for appellant.

*A. F. Triplett,* for appellee.

SMITH, J. Warren and Celia Boyd, husband and wife, owned as tenants by the entireties, three lots in the city of Pine Bluff. Warren died in 1931. After Celia's death in 1945, her heirs brought suit in ejectment to recover possession of the lots from Rayford Talbert, referred to by the witnesses as Ray, who was in possession, claiming ownership. Ray filed an answer in which he claimed title under an oral contract with Warren and Celia, whereby it had been agreed that if he would live with them and take care of them during their lives, he should have title to the lots. He alleged performance of this contract, and prayed that his title be quieted, and that the specific performance of the contract be decreed, and on his motion the cause was trans-

ferred to equity. The relief prayed was granted by the chancery court, and from that decree is this appeal.

Testimony offered by Ray was to the following effect: He and the Boyds lived in Mississippi, where he married their daughter in 1913, with whom he lived until her death in 1921. The Boyds lived with him from 1915 until 1917, and he and Warren farmed together. Warren moved to Pine Bluff in 1921, and he and his wife acquired title to the property here in litigation. Warren sent him a special delivery letter in October, 1931, asking him to come to Pine Bluff. He went to Pine Bluff, and Warren said to him, "If you will move over here and take care of us until we die, the place is yours," and Celia said, "I will say the same thing. If you will do that I want you to have the place."

Ray testified that he accepted the offer as a contract, and that he removed to Pine Bluff to perform it, and that he did perform the agreement on his part. He did not go to Pine Bluff at once, but returned to Mississippi where he finished gathering his crop, consisting of twenty-one bales of cotton, after which he went to Pine Bluff. He took all of his personal effects, including a quantity of meat which he had cured and which was consumed by the Boyds and himself. He testified that Warren said that he did not feel like Ray was his son-in-law, and that Warren always thought of him as a son, and one of the numerous witnesses who testified in Ray's behalf referred to him by that name.

Many of the nearest neighbors and closest friends of Ray and Celia testified in Ray's behalf, and if their testimony is to be credited, there appears little doubt that Warren and Celia made the contract under which Ray claims title. Several of the witnesses testified that the terms of the contract were repeated to them by both Warren and Celia, it being explained that it was desired that they might be witnesses if Ray's right to the property was questioned after their death. The explanation offered of the failure to evidence this contract by some writing is that Warren and Celia were ignorant and illiterate.

Now the law is that contracts of this character must be proved by testimony that is clear, decisive and convincing. *Williams* v. *Williams,* 128 Ark. 1, 193 S. W. 82; *Walker* v. *Eller,* 178 Ark. 183, 10 S. W. 2d 14.

The reason for the rule is that the finding that there was such a contract depends upon the testimony of witnesses who are living, and the decedent is not present to rebut that contention. We think the testimony meets this requirement of the law, although the testimony tending to prove the contract is not undisputed. But the law does not require that the testimony be undisputed. It suffices if the testimony which is credited and believed to be true clearly, decisively and conclusively establishes the existence of the contract. The rule is the same as in the case of reformation of a written instrument which will be ordered only upon testimony which is clear, cogent and convincing. *Sturgin* v. *Hughes,* 206 Ark. 946, 178 S. W. 2d 236; *Sewell* v. *Umsted,* 169 Ark. 1102, 278 S. W. 36; *Meekins* v. *Meekins,* 168 Ark. 654, 271 S. W. 18.

To prevail, Ray must not only prove that he had such a contract, but he must also show that he performed it, and there is more conflict on this issue than there is in regard to the existence of the contract. According to Ray's own testimony, the contract required him to pay the taxes on the property, to feed, clothe and furnish fuel and necessary medical attention to both Warren and Celia during their lives.

The strongest circumstance tending to show that Ray had not complied with this contract by furnishing Celia necessary food and fuel was that offered by a welfare worker who testified that for some time Celia was given aid, which would not have been given "if she had an independent living." It is a matter of common knowledge that many persons, with little pride or compunction of conscience, received this aid. Ray admitted that this aid was given Celia, but he testified that it was not required, and that Celia used this aid entirely for her personal purposes, and that he at all times supplied the necessities suitable to their condition.

On the whole, however, the testimony of this witness was not unfavorable to Ray. This welfare worker testified that Celia told her that Ray had promised Warren on Warren's death bed that he would take care of Celia during the remainder of Celia's life, and that Ray had paid her taxes and furnished her fuel.

It was shown without dispute that Ray made only a few minor repairs of the house, but these were all the repairs which were made, and that he paid premiums on the burial policy from the proceeds of which Celia's funeral expenses were paid. Several neighbors testified that on several occasions Celia had eaten a meal with them, but Ray explained that this was not through lack of food at home, as he raised and cured his own meat, had a large garden and had plenty of garden truck; that he drove a delivery wagon and with the money thus earned he supplied Celia's wants, suitable to their humble station. Tax receipts found in Celia's possession showed that all taxes had been paid in Celia's name. Ray did not claim to be the owner of the property until after Celia's death, nor did he claim that he had personally paid the taxes, but he did claim to have furnished the money with which they were paid, and the testimony of the welfare worker is corroborative of this statement.

Two letters were offered in evidence over objection of Ray's counsel addressed to a brother of Celia, in which she appealed for assistance in paying her taxes, and in getting Ray out of the house, as he was paying no rent. There was no testimony, however, that Ray had ever paid rent or had agreed to do so, and no reason is shown why Celia could not have ordered him out of the house if he was not complying with his contract to furnish her support.

However, we think these letters were not admissible in evidence as they offend against the hearsay evidence rule, and were not statements against interest. Celia did not write these letters, but a neighbor testified that she wrote them for Celia. If Celia was mercenary enough to apply for aid, which she did not require, she might

also have been mercenary enough to apply to her brother for money to pay her taxes, when Ray was paying them.

But if the letters were inadmissible in evidence, it is unnecessary to consider what weight should be given them had they been competent. The subject of Self-Serving Declarations is extensively annotated in the chapter on Evidence in 31 C. J. S., page 948, § 216, in which cases are cited from nearly every state in the union, supporting the text from which we extensively quote as follows: "Generally a party cannot make evidence for himself by his own declarations, and it is a well-established general rule that a statement of a party, whether oral or written, which is of a self-serving nature is not admissible in evidence in his favor. Such declarations are not rendered admissible by the mere fact that they were made in the presence of, or in a conversation or correspondence with, the opposing party or his agent, in the absence of assent to their truth by the opposing party, see subdivision (b) of this section; by having been brought to the attention of the other party or his agent and commented on by him; by having been part of a conversation or correspondence with the declarant's witness; or by being brought out on cross-examination. Such declarations are equally inadmissible when offered by the declarant's representatives, devisees, or heirs, since, as is noted, *infra*, this subdivision, the death of a declarant does render his statements admissible. The rule of exclusion also applies when such declarations are offered in evidence by third persons on their own behalf.

"The rule excluding self-serving declarations is a part of the hearsay rule, and its purpose is to prevent the manufacturing of evidence. A self-serving declaration within the rule is one made by a party in his own interest at some place and time out of court and it does not include testimony which he gives as a witness at the trial." . . .

"Effect of death of declarant. The death of the declarant does not render his self-serving declarations admissible, except in jurisdictions where the rule has been changed by statute."

These statements are consonant with rules announced by this court dealing with the subject in the following cases: *Strickland* v. *Strickland,* 103 Ark. 183, 146 S. W. 501; *Caffey* v. *Allison,* 107 Ark. 153, 154 S. W. 202; *Carter* v. *Younger,* 123 Ark. 266, 185 S. W. 435; *Raymond* v. *Raymond,* 134 Ark. 484, 204 S. W. 311; *Watson* v. *Davidson,* 141 Ark. 591, 217 S. W. 777; *Black* v. *Hogsett,* 145 Ark. 178, 224 S. W. 439; *Arkmo Lumber Company* v. *Cantrell,* 159 Ark. 445, 252 S. W. 901; *Davis* v. *Falls,* 172 Ark. 314, 288 S. W. 723; *Heard* v. *Farmers' Bank,* 174 Ark. 194, 295 S. W. 38; *Beichslich* v. *Beichslich,* 177 Ark. 37, 5 S. W. 2d 739; *Brotherhood of Railroad Trainmen* v. *Fountaine,* 155 Ark. 578, 245 S. W. 17; *Dunaway* v. *Ragsdale,* 177 Ark. 718, 9 S. W. 2d 6; *Smith* v. *School Dist.,* 192 Ark. 792, 94 S. W. 2d 706; *Gray* v. *Gray,* 199 Ark. 152, 133 S. W. 2d 874. There are other cases in our reports to the same effect.

In view of the relationship of Ray and Celia, and the long period of time during which he lived in her house, until she became an old woman, during all of which time Celia was without income, so far as the record shows, except the contributions made to her by the government, we are constrained to hold that the chancellor was warranted in finding that Ray had substantially complied with his contract, and was entitled to the benefits inuring from its performance, and the decree granting Ray the relief prayed is affirmed.