MARTIN *v.* MARTIN.

4-8002                                                   198 S. W. 2d 408

Opinion delivered December 9, 1946.

Rehearing denied January 20, 1947.

*J. Loyd Shouse* and *Merle M. Shouse,* for appellant.

*Ben Henley* and *Willis & Walker,* for appellee.

ED. F. McFADDIN, Justice. Appellee, Marvin Martin (a minor), by his guardian and next friend, Vesta Rohe (now Taylor) filed this suit against appellant, Mrs. Nettie Martin, praying that the minor be decreed to be the owner of certain real estate in Boone county, known and referred to as the "Touch-Me-Not Place," devised to him by the will of his father, L. M. Martin. From a decree granting the relief prayed, there is this appeal.

L. M. Martin was at one time a respectable citizen. He had a wife (appellant) and three daughters. In 1932, he began an illicit relationship with Mrs. Vesta Rohe, which continued until his death in 1942. After 1934,

L. M. Martin's relationship with Vesta Rohe was open and notorious. The appellee, Marvin Martin, now 11 years of age, is admitted to be the child of Mrs. Vesta Rohe and L. M. Martin, although they were never married, and L. M. Martin was never divorced from the appellant. On July 7, 1942, L. M. Martin departed this life, leaving a last will and testament dated June 24, 1942, which—omitting attestation of witnesses and land descriptions—is as follows:

"Last Will and Testament of L. M. Martin

"Know all men by these presents:

"That I, L. M. Martin, of lawful age and of sound and disposing mind and memory do hereby make and publish and declare this my last will and testament:

"First, I am not unmindful of my beloved children, Verna Martin Rogers, Gladys Martin Womack, and Maxine Martin, and my wife, Nettie Martin, whose financial interests have been in part cared for in the past.

"It is my will and purpose that such further financial and property benefits as they may receive from my estate be had and received by operation of law out of the properties of which I may die seized other than the properties included in this will.

"I will and bequeath unto Marvin Martin fee simple title to the following property situated in Boone county, Arkansas, to-wit:

(substantially the lands here involved)

"In witness whereof I have hereunto set my hand this 24th day of June, 1942, in the presence of D. N. Stewart and Andy Harris who attest the same at my request.

"Signed: L. M. Martin, Testator."

After a lapse of three years (the reason therefor being mentioned later), the will was probated, and Floyd Rogers became the administrator of the estate. This suit was filed on November 1, 1945, after it had been discovered that the record title to the Touch-Me-Not

Place was in Mrs. Nettie Martin by virtue of a deed to her from L. M. Martin dated in 1930, but not recorded until 1936. The plaintiff alleged that Mrs. Nettie Martin had reconveyed the place to L. M. Martin; and that such deed had been lost or purloined before being recorded, and that L. M. Martin was the real owner of the place when he executed his will.

In her amended answer, Mrs. Nettie Martin: (1) claimed ownership of the land by virtue of the 1930 deed to her; (2) denied that she had ever reconveyed the lands herein to L. M. Martin; and (3) made this statement in her verified answer:

"She says that she is inexperienced in business affairs; that soon after her husband, the deceased L. M. Martin, became entangled with Vesta Mae Rohe Taylor, suing as next friend herein, and about December, 1932, she turned over all of her business affairs to her son-in-law Floyd Rogers, who thereafter transacted all her business and conducted all transactions with the deceased; that the deceased continued to look after most of her properties and particularly the farming lands and unimproved lands; that deceased, L. M. Martin, continued to own some tracts of lands in his own rights; that frequently he wanted her to execute deeds of conveyance to various parties; that in all such transactions she and her said husband dealt through the medium of their said son-in-law Floyd Rogers, and this defendant signed such papers and only such papers as the said Floyd Rogers advised her it was proper that she sign; that she never signed and never intended to sign any deed reconveying the lands herein involved to her said husband, L. M. Martin."

The evidence is voluminous, and in some places is quite sordid; but the issues in this court may be summarized and disposed of under the two headings herein listed.

I. *The Admission of Incompetent Evidence.* All the evidence was taken on deposition. Counsel for the appellee persisted in having various witnesses state the

remarks made by L. M. Martin to show his claim of ownership of the lands in question. Appellant objected to this evidence at the time the depositions were taken and at all other stages in the case. The evidence was clearly inadmissible. In 22 C. J. 229, the rule, supported by many cases, is stated: "An owner of property cannot use as evidence in his favor the self-serving declarations of his predecessor in title . . . ." The facts in this case do not bring it within any exception to the above quoted statement.

See, also, opinion in the case of *Hill* v. *Talbert, ante,* p. 866, 197 S. W. 2d 942.

When the case was presented to the chancery court, appellant filed a motion to strike the incompetent evidence (itemizing it in detail). The chancery court deferred any decision on the motion until final decree; and then in the final decree recited that the findings were made "from the competent evidence adduced." Appellant lists here the incompetent evidence objected to in the lower court; and we have stricken from our consideration all of the testimony relating to conversations had with L. M. Martin, and information received from Martin's words; and we proceed to decide the case solely on the competent evidence. Since the appellant has been forced to lengthen her briefs because of the incompetent evidence, we are making an adjustment in adjudging the costs as hereinafter shown.

II. *Is the Legally Competent Evidence Sufficient to Entitle the Plaintiff to the Relief Prayed?* Plaintiff sought to prove a lost deed. The rule on the *quantum* of proof in such cases was well stated by Mr. Justice Wood in *Erwin* v. *Kerrin,* 169 Ark. 183, 274 S. W. 2:

"The rule is well established in this State, as well as by the authorities generally, that the burden is upon one who claims title under the alleged lost instrument to establish the execution, contents, and loss of such instrument by the clearest, most conclusive, and satisfactory proof. *Nunn* v. *Lynch,* 73 Ark. 20, 83 S. W. 316; *Kennedy* v. *Gilkey,* 81 Ark. 147, 98 S. W. 969; *Jacks* v.

*Wooten,* 152 Ark. 515, 238 'S. W. 784. See, also, 25 Cyc. 1626, and numerous cases cited in note; 17 Cyc. 778, and numerous cases cited in note. Note to *Clark* v. *Turner,* 38 L. R. A. at page 441; *Johnson* v. *McKamey,* 53 S. W. 221; *Rhodes* v. *Vinson,* 9 Gill. (Md.) 169, 52 Am. Dec. 685.''

The chancery court ''from the competent evidence adduced'' found (1) that L. M. Martin had deeded the Touch-Me-Not Place to Mrs. Nettie Martin in 1930; and (2) that Mrs. Nettie Martin had reconveyed the said place to L. M. Martin; and (3) that L. M. Martin died seized and possessed of the place. The latter two of these findings are challenged by the appellant. We hold that the chancellor's findings are correct under the *quantum* of proof rule as previously mentioned.

To present the full situation in this case would require the cataloguing of details that had better be left unwritten. But certain facts are necessary to an understanding. In 1930, L. M. Martin was Sheriff of Boone county, and Floyd Rogers was his business associate. Martin owned several hundred acres of land (including the 'Touch-Me-Not Place, which was his favorite), and also some other property. Before he went out of the sheriff's office and into the mercantile business with Rogers, Martin, in 1930, prepared and executed several deeds conveying some of his property to his wife and some to his two adult daughters. The youngest daughter was an infant; so no deed was made to her. This fact is significant, in that it indicates that Martin was not conveying property to any person who could not reconvey to him when he desired. Martin subsequently sold some of the lands he had previously conveyed to his wife; and she joined him in deeds to the purchasers. Later Martin caused one daughter to reconvey to him the property he had conveyed to her. At another time Martin executed a mortgage to Rogers as a ''cover-up.'' We mention these to show that conveyances and reconveyances were a part of the pattern in the life of Martin. Floyd Rogers was the only witness for the appellant, and—in telling about Martin's attitude after

executing these deeds—Rogers said (as abstracted by appellant):

"He collected rents and everything. He never made any strict settlement with the folks, but was always liberal and helped the girls and Mrs. Martin. He told me when he made the deeds that he would continue to oversee and look after the places, and that was the understanding."

As aforesaid, Martin executed the deeds in 1930, and Rogers kept them in the safe in the mercantile store, then owned by Martin and Rogers. The deeds remained unrecorded until 1936, and were all the time after 1932 in this store safe in the constructive possession of both Martin and Rogers. In 1932, there began the affair between Martin and Vesta Rohe; and thereafter all communications between L. M. Martin and his wife (appellant) were conducted through Floyd Rogers. In 1935, the appellee was born. It is significant that Rogers then (in 1936) recorded the deeds, without any further instructions from Martin. Later (in 1937) Martin sold his interest in the mercantile business to his other son-in-law (Harold Womack), but continued to leave all of his papers in the store safe until 1939 or 1940.

It was then (1939 or 1940) that Martin was sick at the Midway Hotel in Harrison, and sent to the store for his deeds and papers that were supposed to be in the safe. He discovered that some of the deeds, papers, etc., were missing, and "he raised a howl." He sent for each of his sons-in-law, and then for his lawyer; and they came to his room at the hotel. As a result, certain deeds were prepared and delivered to Martin, and he became pacified. No witness could definitely swear that any one of those deeds described by section, township and range the lands known as the "Touch-Me-Not-Place"; but the evidence clearly shows that some deeds were executed and delivered to Martin, and that one such deed was signed by the appellant. Vesta Rohe definitely swore that there was at that time a deed in L. M. Martin's possession signed by Mrs. Nettie Martin, although Vesta Rohe could not identify the Touch-Me-Not-Place by the

land numbers. A short time after the Midway Hotel episode, as above mentioned, an entirely disinterested witness—W. H. Wingate—testified that he saw a deed in the possession of L. M. Martin, which was signed by Mrs. Nettie Martin, but this witness could not identify the Touch-Me-Not-Place, because the land numbers in the deed were by section, township and range.

Did this deed—in Martin's possession, and signed by Mrs. Nettie Martin—convey the Touch-Me-Not Place? Floyd Rogers (appellant's admitted agent in all matters) admitted that Mrs. Martin did execute a deed to L. M. Martin in 1939-40; but Rogers maintained that the said deed was never delivered, and that it involved lands other than the Touch-Me-Not Place. The disinterested witness, Wingate, saw a deed, signed by Mrs. Martin in the possession of L. M. Martin: so it is evident that whatever deed Rogers held as undelivered is entirely distinct from the deed that Martin received from Mrs. Nettie Martin. The fact that Rogers held as undelivered a deed describing other lands makes certain the fact that the deed from appellant, which L. M. Martin possessed and which Wingate saw, did convey the Touch-Me-Not Place.

The record also shows what the parties did after 1939-40 regarding the Touch-Me-Not Place. L. M. Martin moved on the place, built a house on it; and made other improvements. He paid the taxes. He signed the government soil conservation contracts as the owner. He received all the rents and profits. In 1942, he executed the will, as previously copied. It is not shown that Martin ever claimed to own any of the land not duly deeded to him; and it is shown that his occupation, possession and enjoyment of the Touch-Me-Not Place was well known from 1940 until his death. From these facts, and the others in the record, it is clear that Mrs. Martin did deed the Touch-Me-Not Place to L. M. Martin, and that he did own the place at the time of his death in 1942.

Here are some of the others facts: Vesta Rohe testified that after the death of L. M. Martin she went

to Floyd Rogers, and to another named party as the representatives of Mrs. Nettie Martin; and that this latter representative agreed with Vesta Rohe that, if she would withhold probating the will, the Martins would recognize Marvin Martin as an heir of L. M. Martin, and would also deed him the Touch-Me-Not Place. The representative never denied making that statement; in fact, he said, ''I might have said it.'' Because of these conversations, Vesta Rohe delayed the probating of the will, and brought this suit for her son only after the Martins had refused to execute the deed to the Touch-Me-Not Place. The Martins did recognize appellee as an heir of L. M. Martin; and—notwithstanding Rogers' testimony to the contrary—we are convinced that they also agreed to deed appellee the lands, just as Vesta Rohe testified. On the strength of the conversation of Vesta Rohe with Floyd Rogers and the other representative of Mrs. Martin, Vesta Rohe delivered to Floyd Rogers the key to the safety deposit box of the bank where L. M. Martin had kept his papers after the Midway Hotel experience in 1939-40. It was this acceptance of the key to the safety deposit box by Floyd Rogers, and his opening of the box in the absence of Vesta Rohe, that allowed her to make the charge against him, that he had purloined the papers. We do not go to that extent in deciding this case. We merely hold that competent evidence amply supports the chancellor's decree, which is affirmed.

But because of what was said in Part I about the incompetent evidence lengthening the record, and because this is an equity case, we adjudge all of the costs of this appeal to be paid equally by appellant and appellee.

Affirmed with division of costs.